## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

Plaintiff,

vs.                                           No. CR. 07-791 MCA

**LEHMAN SMITH,**

Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Lehman Smith's *Motion to Suppress on Voluntariness Grounds* [Doc. 22], filed May 24, 2007, and Defendant's *Motion to Suppress on Prompt Presentment Grounds* [Doc. 23], also filed May 24, 2007.  On June 19, 20, and 22, 2007, the Court held an evidentiary hearing on Defendant's motions.  Having fully considered the pleadings of record, the applicable law, the evidence and arguments of counsel presented at the hearing, and otherwise being fully advised in the premises, the Court denies both motions based upon the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### Defendant's Physical Condition on Saturday, March 24, 2007 and the Early Hours of Sunday, March 25, 2007

1.     On Saturday, March 24, 2007 and into the early morning hours of Sunday, March 25, 2007, Defendant Lehman Smith consumed a large amount of Budweiser and Steel Reserve malt liquor, smoked marijuana, and used cocaine.

2.     Kevin Cleveland is Defendant's cousin.

3.     On the morning of Saturday, March 24, 2007, Cleveland witnessed Defendant drinking beer and smoking marijuana.

4.     Cleveland last saw Defendant at approximately noon on Saturday, March 24, 2007.

5.     Kyle Moses is also a cousin of Defendant.

6.     Defendant came to Moses's home on the evening of Saturday, March 24, 2007.

7.     According to Moses, Defendant was drunk when he arrived.

8.     Moses recognizes Defendant as drunk when Defendant talks a lot, slurs his words, and appears with red eyes.

9.     Moses testified that Defendant appeared in this drunken condition when he saw him on March 24, 2007.

10.    While at Moses's house, Defendant did not drink, but he smoked marijuana and "did" two lines of cocaine.

11.    Moses and Defendant eventually left the Moses home and went to Bluewater Lake State Park.

12.    At Bluewater Lake, Moses testified that he witnessed Defendant drink what Moses estimated to be more than 20 cans of Budweiser and Steel Reserve.

13.    I accept that aspect of Moses's testimony that he witnessed Defendant consume quantities of Budweiser and Steel Reserve; however, I do not accept as credible that aspect of his testimony indicating that more than—or even—20 cans were consumed. I find that by his own admission, Moses was himself intoxicated, and his perception

2

and estimation of Defendant's consumption was greatly exaggerated.

14.   Moses and Defendant then left Bluewater Lake for Moses's brother's house, where Defendant continued to drink.

15.   Moses last saw Defendant at about midnight on Saturday, March 24.

16.   Mitchell Begay is Defendant's cousin-brother.

17.   On the evening of Saturday, March 24, 2007, Defendant came to Mitchell Begay's house.

18.   From the late evening hours of March 24 until sometime after midnight, Mitchell Begay testified that he saw Defendant drink approximately 20 cans of Budweiser and Steel Reserve.

19.   I accept that aspect of Mitchell Begay's testimony that he witnessed Defendant consume quantities of Budweiser and Steel Reserve; however, I do not accept as credible that aspect of his testimony indicating that more than 20 cans were consumed.  I find that by his own admission, Begay was himself intoxicated, and his perception and estimation of Defendant's consumption was greatly exaggerated.

20.   Mitchell Begay also witnessed Defendant participate in the drinking game called "Quarters."

21.   The point of Quarters is to bounce a quarter into a cup of beer.  Players who miss must drink that cup of beer.

22.   Mitchell Begay described Defendant on the evening of Saturday, March 24 as appearing intoxicated and smelling of marijuana.

23.   According to Mitchell Begay, Defendant had red, droopy eyes and was slurring his words.

24.   Mitchell Begay testified that Defendant's eyes are not red or droopy and he does not slur his words when he is sober.

25.   Mitchell Begay described himself as very intoxicated on the evening of Saturday, March, 24, having consumed approximately 18 to 20 cans of beer.

26.   Mitchell Begay last saw Defendant at about 3:00 a.m. Sunday, March 25, 2007.

27.   Charlynn Begay is the wife of Mitchell Begay and an in-law of Defendant.

28.   Charlynn Begay first encountered Defendant after sundown on Saturday, March 24, 2007.

29.   Charlynn Begay witnessed Defendant drinking Budweiser and Steel Reserve.

30.   Charlynn Begay believed that Defendant was "high" because his eyes were red and low.

31.   Charlynn Begay accompanied Defendant and others went to Bluewater Lake, where they intended to camp for the night.  They left, however, upon realizing that they lacked proper gear to stay over.

32.   Charlynn Begay testified that she saw Defendant drink four or five cans of beer at Bluewater Lake.

33.   After leaving Bluewater Lake, Charlynn Begay testified that she witnessed Defendant drink approximately 20 to 25 cans of beer.

34.   I accept that aspect of Charlynn Begay's testimony that she witnessed Defendant

consume quantities of Budweiser and Steel Reserve; however, I do not accept as credible that aspect of his testimony indicating that more than—or even—20 cans were consumed.

35.    Charlynn Begay also witnessed Defendant smoking marijuana.

36.    Charlynn Begay described Defendant as "pretty intoxicated [and] unable to stand. He couldn't speak. He was slurring. He was pretty out of it." [Testimony of C. Begay].

37.    According to Charlynn Begay, Defendant's eyes were red and droopy and his speech was slurred.

38.    Charlynn Begay last saw Defendant at approximately 1:00 or 2:00 a.m. on Sunday, March 25, 2007.

39.    Nellie Ration is Defendant's grandmother.

40.    Defendant lives with Ms. Ration.

41.    At approximately 7:00 a.m. on Sunday, March 25, 2007, Crownpoint Department of Public Safety Senior Patrolman Anthony Ashley came to Ms. Ration's home in search of Defendant.

42.    Officer Ashley followed Ms. Ration to a back room, where they found Defendant asleep on the floor.

43.    When Defendant did not respond to Officer Ashley's verbal requests to get up, Officer Ashley roused Defendant by applying pressure to the back of Defendant's ear

44.    Ms. Ration and Officer Ashley both testified that once Defendant awoke, his eyes appeared to be red and he smelled of alcohol.

45. According to Officer Ashley, however, Defendant at this time was speaking clearly to Ms. Ration.

46. Ms. Ration testified that Defendant seemed not to know where he was.

47. Ms. Ration did not see any alcohol in the room.

48. As Officer Ashley escorted Defendant from the room, Ms. Ration noticed that Defendant was staggering.

49. Officer Ashley did not notice that Defendant was staggering, but he testified that he was supporting Defendant.

50. At about 7:30 a.m. on Sunday, March 25, 2007, Officer Ashley arrested Defendant on tribal charges of sexual assault.

51. Officer Ashley did not arrest Defendant on any federal charges and, in fact, lacks authority to do so.

52. At approximately 8:00 a.m., Officer Ashley arranged for another officer to transport Defendant to the Crownpoint jail.

## The Questioning of Defendant at the Crownpoint Jail, His Written Statement, and His Presentment to a Federal Magistrate Judge

53. Special Agent Robert Sayegh has been with the FBI for ten years, and has been assigned to the agency's Gallup, New Mexico office since 2004.

54. At approximately 9:00 a.m. on Sunday, March 25, 2007, SA Sayegh received a telephone call from his office directing him to contact Navajo Nation Department of Public Safety Criminal Investigator Rosina Ford about a rape victim.

6

55. CI Ford has been with the Navajo Nation Department of Public Safety for 23 years and has served as a criminal investigator for the past 5 years.

56. SA Sayegh called CI Ford and then went to the Crownpoint Hospital, where CI Ford was interviewing the alleged victim.

57. Once CI Ford finished her interview, she and SA Sayegh went to the Crownpoint jail, arriving at approximately 11:25 a.m.

58. Defendant was brought into a room in which both SA Sayegh and CI Ford were present.

59. By the time SA Sayegh and CI Ford encountered Defendant, approximately four hours had passed since his arrest, and at least eight and one-half hours had passed since anyone had last seen him consume liquor or illegal substances.

60. On direct examination, Defendant testified that the jailer who escorted him to the interview room told him that he "had to talk to" SA Sayegh. [Testimony of L. Smith].

61. On cross-examination, however, Defendant admitted that the jailer did not use those exact words, and stated that he could not remember her precise words.

62. SA Sayegh credibly testified that Defendant

    a.    did not stagger as he entered the room;

    b.    did not miss his chair when he sat down;

    c.    did not smell of alcohol;

    d.    did not have particularly droopy eyes;

    e.    spoke clearly; and

f.      was polite and cooperative.

63.    CI Ford similarly and credibly testified that Defendant appeared to be sober.

64.    CI Ford also described Defendant as "talkative and somewhat laid back." [Testimony of R. Ford].

65.    CI Ford testified that she was sitting approximately three to four feet from Defendant and smelled no alcohol.

66.    SA Sayegh estimated that he has conducted between 75 and 100 subject interviews.

67.    There have been many times that SA Sayegh has encountered an intoxicated interviewee.

68.    In those cases, SA Sayegh has delayed his interview of that individual.

69.    After SA Sayegh introduced himself, he presented Defendant with an *Advice of Rights* form [Exh. 1].

70.    SA Sayegh asked Defendant if he was sober and able to talk, and Defendant replied that he was.

71.    By contrast, Defendant testified that at this time he felt "high and scared." [Testimony of L. Smith].

72.    Given SA Sayegh's observations of Defendant and his personal experience with subject interviews, SA Sayegh reasonably concluded that Defendant was lucid, coherent, and not intoxicated during the interview.

73.    SA Sayegh wrote "sober" in the top left-hand corner of the *Advice of Rights*. [Exh. 1].

74.    SA Sayegh did not confirm Defendant's sobriety with a Breathalyzer test.

75. According to CI Ford, it is the policy of the Crownpoint jail to administer a Breathalyzer test only when a detainee is being arrested for driving while intoxicated.

76. I find and accept as credible SA Sayegh's testimony that his ten years' experience conducting subject interviews allows him to evaluate when someone is able to communicate properly with him.

77. I also find that it was reasonable for SA Sayegh, given his experience and his observations of Defendant, as well as Defendant's representations to him, to believe that Defendant was sober at this time.

78. On the *Advice of Rights* form, SA Sayegh also noted that Defendant had a tenth-grade education. [Exh. 1].  Defendant testified that he left school because he was expelled for tardiness; he was not expelled for bad grades.

79. Finally, SA Sayegh noted that English is Defendant's first language. [Id.].

80. As SA Sayegh made the above three notations, he wrote the time of day, 11:29 a.m., in the top right-hand corner of the *Advice of Rights* form. [Id.].

81. SA Sayegh then read Defendant his rights as reflected on the *Advice of Rights* form.

82. CI Ford confirmed SA Sayegh's testimony regarding his interaction with Defendant prior to the interview.

83. CI Ford testified that she and SA Sayegh have done a number of interviews together and that they are usually conducted the same way each time.

84. I find and accept as credible CI Ford's testimony in this regard.

85. Defendant read and signed the *Advice of Rights* form, by which he waived his rights

and agreed to answer questions without a lawyer present. [Exh. 1].

86.   SA Sayegh credibly testified that Defendant neither asked questions about the form

nor indicated that he was unable to read it.

87.   Defendant signed the *Advice of Rights* form in cursive and, in doing so, did not stray

from the signature line. [Exh. 1].

88.   I find and accept as credible SA Sayegh's testimony that he ascertained Defendant's

level of education, that English was his first language, and that Defendant was lucid

prior to reviewing the Advice of rights form with him and prior to taking his

statement.  I further find that SA Sayegh read Defendant his rights and had Defendant

review his rights before he signed the *Advice of Rights* form.

89.   I find that Defendant understood his rights and that he was capable of making

informed and voluntary choices when he signed the *Advice of Rights* form.

90.   SA Sayegh and CI Ford also signed the form and SA Sayegh wrote the current time,

11:31 a.m., on the bottom of the form.

91.   The *Advice of Rights* form includes eight lines of text under the heading, "Your

Rights." [Exh. 1].

92.   SA Sayegh testified that he did not take a statement from Defendant before advising

him of his rights.

93.   By contrast, Defendant testified that he did not sign the *Advice of Rights* form until

some time after SA Sayegh had begun questioning him.

94.   I find and accept as credible SA Sayegh's testimony that he did not question

10

Defendant before advising him of his rights.

95. I do not credit Defendant's testimony that he was questioned before signing the *Advice of Rights* form.

96. After Defendant signed the *Advice of Rights* form, SA Sayegh began an interview, during which he took notes, that lasted from 11:31 a.m. until 12:39 p.m.

97. Defendant spent part of that approximately one-hour-and-ten-minute time period providing SA Sayegh with an oral statement.

98. Defendant also spent part of that period of time providing a signed written statement. [Exh. 2].

99. On the written statement, Defendant indicated that his date of birth is August 21, 1986, making him 20 years and 7 months old at the time of his interview with SA Sayegh.

100. Defendant signed his written statement in cursive and, in doing so, did not stray from the signature line. [Exh. 2].

101. Defendant testified that it took him a long time to write his statement.

102. Both SA Sayegh and CI Ford credibly testified that Defendant appeared to be thinking as he wrote his statement.

103. On the written statement are initialed cross-outs that Defendant admitted were made by him.

104. It is reasonable to infer that Defendant crossed out parts of his original statement because, upon reflection, he decided to write something different.

11

105.  SA Sayegh testified that he encouraged Defendant to be specific in his statement but did not tell Defendant what to write.

106.  Defendant admitted that the first three and one-half lines of the six-line written statement consist of his own words. [See Exh. 2].

107.  Defendant testified that after he wrote the first three and one-half lines and handed the document to SA Sayegh, SA Sayegh "gave it back to [him], and said to write some other stuff on there." [Testimony of L. Smith].

108.  According to Defendant, SA Sayegh told him to write, "I had sex with her." [Exh. 2].

109.  Defendant conceded, however, that in the first line of his statement he was also talking about having had sex with the alleged victim.

110.  Defendant also testified that SA Sayegh instructed him to write, "I pulled her pants down[,]" on lines four to five.

111.  Defendant admitted, however, that he did not need SA Sayegh to tell him it was necessary to remove clothing to have engage in sexual activity.

112.  With respect to Defendant's statement on line five, "I didn't come inside her[,]" the following colloquy took place between Defendant and counsel for the Government:

> Q: Okay. Okay. "I didn't come inside her." Was that your idea,
> or did Agent Sayegh tell you to write that?
> A: He told me in another way, but I wrote that down.
> Q: You chose your own words?
> A: Yeah.
> Q: He told you something specific to say, but you chose to write
> something else?
> A: Yes. It's a lot easier to write.
> Q: And so that's what—you put those words down; right? Those

were your words then? Not his? They're your words; right? You
just said you wrote it differently.  Am I right, Mr. Smith? That's
right, isn't it?
A: Yeah.

113.    According to CI Ford, the information contained in Defendant's *Written Statement*
        was consistent with what the alleged victim had told CI Ford during CI Ford's
        interview of her.

114.    I find that SA Sayegh urged Defendant to be specific in his written statement.

115.    I also find, however, that SA Sayegh did not *instruct* Defendant as to the specifics
        Defendant was to include in his written statement and that Defendant considered and
        put down his own words when making that statement.

116.    I further find that the period of time that elapsed between when SA Sayegh first began
        asking questions to confirm Defendant's sobriety, level of education, and first
        language, *i.e.*, 11:29 a.m., and when the interview concluded, *i.e.*, 12:39 p.m., was
        reasonable given that Defendant spent part of that time talking with SA Sayegh and
        part of that time deliberating over and making and revising his written statement.

117.    It is undisputed that SA Sayegh and CI Ford were both polite to Defendant during the
        interview.

118.    CI Donovan Bicente entered the interview room about 15 minutes after the interview
        had begun.

119.    CI Bicente testified that SA Sayegh did not threaten or touch Defendant.

120.    CI Bicente further testified that Defendant was not handcuffed during the interview.

121.   I find and accept as credible CI Bicente's testimony in this regard.

122.   CI Bicente testified that he sat down approximately four feet from Defendant.

123.   According to CI Bicente, he could smell no alcohol and Defendant's eyes did not appear red or droopy.

124.   CI Bicente took photographs of Defendant after the interview on March 25, 2007, and those photographs comprise Exhibits A1 to A10.   [Exhs. A1-A10].

125.   Exhibit A3 is a close-up picture of Defendant's face. [Exh. A3].

126.   I do not find that Defendant's eyes appear either red or droopy in the picture that is Exhibit A3.   [Id.].

127.   I find that, in Exhibit A3, Defendant's eyes appear clear.

128.   SA Sayegh credibly testified that, during the interview, Defendant

   a.      did not ask to see a lawyer;

   b.      did not ask to use the bathroom; and

   c.      did not ask for an interpreter.

129.   Both SA Sayegh and CI Ford testified that Defendant first denied having committed a crime, but then made an admission

130.   Both SA Sayegh and CI Ford testified that no threats or promises were made to Defendant during the interview.

131.   I find and accept as credible the testimony of SA Sayegh and CI Ford in this regard.

132.   According to SA Sayegh, Defendant was able to provide responsive answers to SA Sayegh's questions.  He also provided specific answers, such as

     a.     the reason his group had left Bluewater Lake;

     b.     the friends that had been with him at the lake;

     c.     that his alleged victim had hit him; and

     d.     the fact that he had missed a telephone call from his girlfriend.

133.    Among other things, Defendant's level of specificity and accuracy confirmed SA Sayegh's belief that Defendant was in a condition to speak and be interviewed.

134.    SA Sayegh, CI Ford, and CI Bicente witnessed Defendant write his statement.

135.    When SA Sayegh finished his interview with Defendant at 12:39 p.m. on Sunday, March 25, 2007, Defendant remained in tribal custody.

136.    After the interview, SA Sayegh, CI Ford, and CI Bicente drove to the scene of the alleged crime to look around.

137.    SA Sayegh credibly testified that he spent the remainder of Sunday, March 25, as well as Monday, March 26, compiling all the information he had gathered, along with his notes and the data he received from CI Ford, into an affidavit to support an arrest warrant.

138.    SA Sayegh also spent part of those two days speaking with a representative of the United States Attorney and securing an appointment with a Magistrate Judge.

139.    SA Sayegh met with Magistrate Judge Ionta in Gallup in the early afternoon hours of Tuesday, March 27, 2007, at which time Judge Ionta signed a warrant for the arrest of Defendant.

140.    SA Sayegh then faxed a copy of the arrest warrant to CI Ford, who completed her

necessary paperwork and drove Defendant from Crownpoint to Gallup and into federal custody with SA Sayegh.

141. SA Sayegh testified that Defendant was transferred to him at approximately 4:00 p.m. on Tuesday, March 27, 2007.

142. SA Sayegh also testified that within approximately five minutes of the transfer, Defendant was taken before Judge Ionta for his initial appearance.

143. I find and accept as credible SA Sayegh's testimony in this regard.

144. I also find that the five-minute period that elapsed between Defendant's transfer into federal custody and his initial appearance was reasonable.

145. There was no evidence presented at the suppression hearing of any collusion between Navajo and federal authorities with respect to the manner in which Defendant was held at the Crownpoint jail.

146. I find that there was no collusion between Navajo and federal authorities with respect to the manner in which Defendant was held at the Crownpoint jail.

147. Following Defendant's initial appearance before Judge Ionta, SA Sayegh took Defendant to his office, where Defendant was immediately provided access to a telephone and spoke with both an attorney and a representative from Pretrial Services.

148. At approximately 5:40 p.m. on Tuesday, March 27, SA Sayegh booked Defendant into the McKinley County Adult Detention Center.

## II. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

Defendant moves to suppress statements and confessions he made on March 25, 2007 on grounds that (1) he was not promptly presented to the magistrate judge; and (2) his statements were not voluntary because he was (a) not adequately and effectively apprised of his constitutional and statutory rights, and (b) questioned before being advised of his constitutional rights. [See Docs. 22 and 23]. The Court addresses each argument in turn.

### A. Defendant's *Motion to Suppress on Prompt Presentment Grounds*

Section 3501 of Title 18 of the United States Code governs the admissibility of confessions, and subsection (c) allows for their exclusion in certain circumstances. United States v. Headdress, 953 F.Supp. 1272, 1295 (D. Utah 1996). Section 3501(c) provides:

> In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided*, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

18 U.S.C. § 3501(c) (emphasis added).

17

In United States v. Alvarez-Sanchez, the United States Supreme Court held that the terms of § 3501(c) do not apply until the detainee has been arrested for a federal offense because, before that time, "there is no duty, obligation, or reason to bring him before a judicial officer 'empowered to commit persons charged with offenses against the laws of the United States . . . .'" United States v. Alvarez-Sanchez, 511 U.S. 350, 358 (1994) (*quoting* 18 U.S.C. § 3501(c)). Although the defendant in Alvarez-Sanchez was being held on state-law charges (before being arrested for a criminal offense), it is similarly the case that § 3501(c) is not triggered where a detainee, originally held on a *tribal* charge, is eventually arrested on a federal charge. See Headdress, 953 F.Supp. at 1295-96 (applying Alvarez-Sanchez and finding § 3501(c) inapplicable where statements made while sole charge pending against defendant is tribal charge).

To be sure, Alvarez-Sanchez contemplates the "rare scenario" wherein state or local (or, presumably, tribal) authorities, acting in collusion with federal officers, arrest and detain someone in order to allow federal agents to interrogate him in violation of his right to a prompt federal presentment. Alvarez-Sanchez, 511 U.S. at 359. This Court need not address this issue, however, since there was no evidence presented at the suppression hearing to support a determination that tribal and federal officials colluded in this case to deny Defendant his right to prompt presentment. The *Motion to Suppress on Prompt Presentment Grounds* accordingly will be denied.

## B. Defendant's *Motion to Suppress on Voluntariness Grounds*

In Miranda v. Arizona, the Supreme Court explained that "without proper safeguards[,] the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." Miranda v. Arizona, 384 U.S. 436, 467 (1966).  To guard against that danger, "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored."  Id.   Only then can Miranda's twin goals of deterring improper police conduct and assuring trustworthy evidence be achieved.  See United States v. Pettigrew, 468 F.3d 626, 635 (10th Cir. 2006).

A suspect can waive his Miranda rights, but such a waiver must be voluntarily, knowingly, and intelligently made.  See Smith v. Mullin, 379 F.3d 919, 932 (10th Cir. 2004). Determining a waiver's validity involves a two-step process.  See United States v. Curtis, 344 F.3d 1057, 1066 (10th Cir. 2003).  First, the waiver must be shown to have been the product of a free and deliberate choice, rather than intimidation, coercion, or deception (*i.e.*, voluntary).  Second, the waiver must be made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it (*i.e.*, knowing and intelligent).  Smith, 379 F.3d at 932.  "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda  rights have been waived."  Moran v. Burbine, 475 U.S. 412, 421 (1986) (*quoting* Fare v. Michael C., 442 U.S. 707, 725 (1979)).

In determining whether a particular statement or confession is coerced, courts within the Tenth Circuit are instructed to consider the following factors: (1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of [his] constitutional rights; and (5) whether the defendant was subjected to physical punishment.  United States v. Minjares-Alvarez, 264 F.3d 980, 984-985 (10th Cir. 2001).  By evaluating the totality of the circumstances, the Court is best able to assess whether the defendant's will was overborne.  See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  The burden is on the Government to show by a preponderance of the evidence that a confession is voluntary.  United States v. Lopez, 437 F.3d 1059, 1063 (10th Cir. 2006).

Although relevant circumstances to be considered in determining the voluntariness of a statement embrace both the characteristics of the accused and the details of the interrogation, this Court must consider the details of the interrogation *before* turning to Defendant's personal characteristics, because the latter "'are relevant only if this [C]ourt first concludes that the officers' conduct was coercive.'" Lopez, 437 F.3d at 1064 (*quoting* United States v. Erving L., 147 F.3d 1240, 1249 (10th Cir.1998)).

In this case, it is undisputed that SA Sayegh acted professionally and politely during his interview of Defendant.  CI Ford, CI Bicente, and even Defendant himself all testified to that fact.  Neither SA Sayegh nor CI Ford made any promises to Defendant during the interview.  Defendant was not touched and he was not threatened in any way.  In fact, CI Bicente credibly testified that Defendant was not even handcuffed during the interview.

Further, CI Ford described Defendant as "laid back."  While the interview lasted for approximately an hour and ten minutes, the length of the interview, in and of itself, does not necessarily render involuntary a consequent confession.  See, e.g.,  United States v. Jones, 359 F.3d 921, 924 (7th Cir. 2004) .  To the contrary, the length of the interview is just one of the factors to be considered in the "totality of the circumstances" analysis.  In any event, I conclude that a one-hour-and-ten-minute interview was not unreasonably long in this case, given that Defendant spent part of that time speaking to SA Sayegh, and part of that time contemplating, writing, and revising his written statement.  At the time he provided his written statement, Defendant was 20 years old and while he testified that he had been expelled from school in the tenth grade, he also explained that his expulsion was not related to his grades.  Defendant has presented no evidence that his age, intelligence, or education prevented him from voluntarily making his statement.

Defendant contends that his statement to SA Sayegh was involuntary because, among other things, at the time he made it he remained incapacitated from the amount of beer, marijuana, and cocaine he had consumed the day before.  There can be no doubt that on Saturday, March 24, 2007 and on into the early morning hours of Sunday, March 25, 2007, Defendant consumed large amounts of alcohol and smoked marijuana and used cocaine.  The effects of alcohol and illegal drugs, however, *do* wear off with time.  See, e.g., United States v. Makes Room, 49 F.3d 410, 415 (8th Cir.1995) (defendant who was intoxicated when arrested validly waived his rights and made a voluntary confession 13 hours later, by which time effects of alcohol had worn off).

21

In this case, SA Sayegh began interviewing Defendant at approximately 11:30 a.m. Sunday, March 25, 2007, which was 8 ½ hours after anyone credibly testified that he was last seen drinking or using drugs.  He was woken by his grandmother and Officer Ashley at approximately 7:00 a.m. on Sunday.  Mitchell Begay testified that he saw Defendant awake at 3:00 a.m. on Sunday; Defendant, therefore, could not have slept more than four hours before being wakened.  To the extent that Defendant slept for four or fewer hours that evening, fatigue in and of itself is insufficient to render a confession involuntary.  See United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990) ("Intoxication and fatigue do not automatically render a confession involuntary; rather, the test is whether these mental impairments caused the defendant's will to be overborne.").  Further, to be sure, SA Sayegh, CI Ford, and CI Bicente all credibly testified that Defendant (1) appeared sober and was not staggering when he entered the interview room; (2) did not smell of alcohol; (3) did not appear to have droopy eyes;[1] and (3) spoke clearly and was responsive and detailed in his answers to SA Sayegh's questions.  I conclude that Defendant knowingly and voluntarily waived his rights before speaking with SA Sayegh and also that he voluntarily provided SA Sayegh with a written statement.  See United States v. Brooks, 125 F.3d 484, 490 (7th Cir. 1997) (suppression motion of defendant who claimed to be sleep-deprived and under aftereffects of crack cocaine when he waived rights and gave statement to FBI agents was properly denied where defendant appeared wide awake, coherent, and alert during interview

---

[1] Exhibit A3, a close-up photograph of Defendant's face, taken by CI Bicente after the interview, shows Defendant with clear, as opposed to red, eyes.

and gave agents no reason to believe he was in anything but sober condition).  Defendant's motion to suppress is denied.

## III. CONCLUSION

Having considered the totality of the circumstances, I find that Defendant Lehman Smith voluntarily, knowingly, and intelligently waived his rights under Miranda.  I further find that he made a voluntary statement to SA Robert Sayegh, and that he did so while sober, alert, and coherent.  For these reasons, Defendant's motion to suppress for an involuntarily made statement is denied.  Because I find that Defendant's prompt-presentment argument fails as a matter of law, his motion to suppress on prompt-presentment grounds is denied as well.

**IT IS, THEREFORE, ORDERED** that Defendant's *Motion to Suppress on Voluntariness Grounds* [Doc. 22] is **DENIED**;

**IT IS FURTHER ORDERED** that Defendant's *Motion to Suppress on Prompt Presentment Grounds* [Doc. 23] is **DENIED**.

**SO ORDERED** this 24th day of October, 2007, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge